Good morning, Your Honors. May it please the Court, my name is Carol Villegas from the law firm Labaton-Sustaro, and with me is Michael Biggin from the firm of Bernstein-Leapheart, and we represent the Plaintiffs in this action. This is an appeal from a dismissal of a complaint in a securities fraud case where the district court found that plaintiffs did not adequately plead scienter. As the Court is well aware, plaintiffs in a class action securities case can plead scienter one of two ways. They could plead it through allegations that support actual knowledge, and they could also plead it through allegations that support deliberate recklessness. We plead at a minimum deliberate recklessness here in two ways. First, we plead it through personal, firsthand knowledge allegations of confidential witnesses who were at the company during the class period. Second, we also plead at a minimum deliberate recklessness through hearsay allegations that when looked at holistically, you could also determine that we pled at a minimum deliberate recklessness. So I just want to take the personal, firsthand knowledge allegations first. And just as a quick background, I'm sure you're all familiar with the company Lifelock. Their business model is really to exploit the public sphere of identity theft because it's so rampant. We allege that when the company said they were providing near real-time fraud alerts to assuage these fears, they were misleading the public and the market. Well, to a fraction of their customers. Well, actually, the allegations in the complaint suggest that it wasn't to a fraction of their customers. We have confidential witness number five, and that confidential witness tells us, based on her personal knowledge, that she prepared these reports. And the report showed that 70 percent of credit check alerts were stale or a week old. No, that doesn't answer what I was referring to. What I was referring to, and I'll apologize to you as well for my voice, is that the product that the company sells has different levels. And it's my understanding that only, and I've now forgotten the name of it, but only the ultimate service is the one that identifies real-time alerts as part of their service. Further, I've got to say, I've been besieged like many other people have been by ads and e-mail and so forth from Lifelock. And it seems to me what they're mostly selling is the follow-up afterwards. And so when I say to a fraction of their customers, what I mean is the notion that they're giving real-time alerts is not to their whole customer base. It's to one part of it, the ultimate customer. And it's only part of the service, and indeed maybe not that important a part of the service, that it's advertising and promoting. So I lean back and I say to myself, okay, you're saying these notices are stale. We're not talking about bread here. What's stale mean in this context? So first, Your Honor, I think you may be incorrect about the fact that they're only, respectfully, that they're only providing these alerts to the ultimate customers. The three tiers, the standard, the ultimate, and the ultimate plus, whatever they are, the first one actually does provide near real-time alerts based on an algorithm. So the highest one provides the alerts every single time you're standing in a store and you buy something, like when you use your Amex and it pops up on your phone. That's definitely the highest level. The lowest level also provides near real-time alerts when it detects through the algorithm that they think it's fraud. So you're getting the near real-time alerts any time Lifelock thinks it detects fraud. And at the highest level, you're getting it every single time. So is it clear which one CW5 was talking about? Yes, CW5 is definitely talking about the highest level. These are 70 percent stale. They're a week old, which means when you're standing in the Verizon store and you're opening your phone account or when you're at the Banana Republic, like Schneider says, you're not getting these alerts. And what difference does that make? I mean, thanks to data breaches and especially government data breaches, I'm now subscribed to several credit check services. And as recently as last summer, I got a notice that somebody was trying to use, indeed it was my government travel card, at a gas station in Georgia. But I didn't get that notice until a couple days later. It really didn't affect me. I couldn't have done anything about it. The complaint and the other materials you presented talk about how the customers really like this because it lets them know the service. But I don't know that it's such an important part of what I would actually get from LifeLock or a customer. I wonder, does it matter that I get it while I'm standing in line as opposed to two days or a week later in terms of the ultimate impact of my credit report? Well, defendants say it does. They say if you get it when you're standing on line, you can stop the fraud from happening. We have other allegations, though, that don't just limit it to these credit check alerts that are at the top level. We have allegations from another confidential witness, CW4. She was there through October 2014 of the class period. And she tells us that LifeLock had planned weekly shutdowns, Tuesday and Thursday, for up to 12 hours. And at that time, no alerts were going out, not just credit check alerts, but the ID analytic alerts and all the alerts. So you have a situation where 0% of the alerts are going out. In terms of securities fraud, you have to remember that the reason why defendants are telling the market you should invest in our company is because they know customers like getting these real-time alerts. That's what adds value. That's what their business model is. And you also have to take into consideration that LifeLock was operating under an FTC consent decree during this time. And what the consent decree said was, you know, you got in trouble in the past because you lied about providing these near real-time alerts. So the consent decree says, you need to be on top of this. You need to make sure that when you say you're providing near real-time alerts, you are. Was it really focused on this real-time aspect or other aspects of what they had said in the past? So there were several aspects. The near real-time alerts was part of it. They were also concerned about the security of the customer's data. But if you look at the corrective disclosure at the end of the class period, one of the things that the FTC dinged them on was the fact that they weren't providing near real-time alerts. So obviously this was important. And in terms of materiality for investors themselves, I would just say that the near real-time alerts, if those weren't working, then LifeLock's business model is kind of broken. I mean, if they're not able to prevent fraud, which is one of the things that they build themselves at, as then, you know, people would stop signing up for the service and investors would stop buying the stock. So you're making a leap there, that it is, that this is the piece that prevents fraud. I'm really skeptical about that. Well, it's not me, Your Honor. If you look at the false statements that we've alleged throughout the class period, I mean, I counted like 20 times that Defendant Davis and the one-time Defendant Schneider said, you know, in describing the service, this is why people buy our service. That's a different statement. That may suggest it's an important marketing tool, but it doesn't suggest that's the piece that prevents fraud. Sure. But if, well, no, they do say that it's the piece that prevents fraud. I believe Defendant ---- Point me to that. Because what I saw is the kind of statement that you just gave us, which is that customers like that. They're really impressed by it. Sure. Of course, the customer he's using as an example is standing in line at Verizon himself initiating the transaction. There's no fraud there. So what prevents the fraud from this? So the fraud is prevented if someone obtains your identity and wants to open up a phone and goes into the Verizon store and tries to use your identity and you're at work and you're sitting in your office and you get a pop-up that says, we just detected someone trying to use your personal information at Verizon. Is this you? And you can click no. That immediately goes to the Verizon store and the Verizon store says, hey, Mr. So-and-so, we're going to need some more information. And he leaves. That's exactly in one of the false statements. And that happens so that no one would even care about real-time alerts if it wasn't for the idea that it prevented fraud. Isn't that what you're saying? Of course, yes. Thank you, Your Honor. That is what I'm saying. And that's one of the services that LifeLock touted. And so if you go back to the confidential witnesses that we have, CW5, who's very important to our case because she's the one who aggregates these alerts and puts them into reports and says 70% staleness. CW4, who talks about the system shutdown, that when alerts actually do go out, only 20% are getting through. Behind that backdrop, we have another important allegation from CW5, who, through her own personal knowledge, talks about a meeting where Defendant Schneider said, I am aware of the stale alerts. She used those words. It seems like your arguments for Sienta are strongest as to Schneider. You've focused a lot on Schneider. And then it seems like you kind of connect Davis to Schneider. And then I'm wondering where power is. Like, are you even still pursuing power? What is your evidence or an argument against power? So we are, Your Honor. And I would say I agree with you that I think our allegations against Schneider are very, very strong. But I would put power in Davis under the bucket of the Oracle standard for recklessness, just like I would Schneider. And the standard in Oracle, this is 627F3rd at 390, says, an actor is deliberately reckless if he has reasonable grounds to believe material facts existed, but nonetheless failed to obtain and disclose such facts, although he could have done so without extraordinary effort. So I think for Schneider, you know, we... Let's talk about power. Sure. How does power fit into that? Absolutely. Let's talk about power in Davis. So we have a similar inference from them in that we know that there are reports that talk about the problem with the alerts. And they could have accessed these reports without extraordinary effort because they could have gotten them from senior levels of management. We know from CW5 that senior levels of management got these reports. We'd like the inference that Davis and power are senior levels of management. But even if you don't want to agree with that, there is definitely an inference that the CEO and the CFO could have obtained these reports from the senior levels of management. And, again, just going back to that FTC consent decree, which puts them on notice, they all know that the FTC is paying attention to these alerts, and that if they don't pay attention to these alerts, they're subjecting the company to regulatory action. So I would say that those two are allegations against Davis and power, along with allegations that we plead that happened before the class period. Now, I understand that they may not carry as much weight. Can I jump you to a different question? Sure. So you have a lot of statements that you say are false. If we think some of them are false but not all of them, and they're, like, sprinkled through the middle, some that aren't false, does it matter? Like, if we were to not agree with you about the statements in the middle, this is all hypothetical. I have no idea if we'll agree with you about any of it. But let's say we agree with you about the start of the period, the end of the period, and a few things in the middle, but not the rest. Does that change your legal claim? Or not, because as long as they're, like, periodic, it's enough? Yes. As long as they're periodic, it would be enough. And is there a case that says that? I had trouble figuring out where to find that. I believe as long as you find that the first statement you find is false is at the beginning of our class period, and you agree with our corrective disclosure, that starts our class period. Now, if you find that the first statement isn't false, our class period will start with the first false statement that you believe is false and misleading. And then would it be their obligation to come up with something that cured in the middle if the middle became long enough? Is that how this works? I don't understand the second part. I mean, so, like, say you had a false statement, and then two years later another false statement. I guess the defense could say somewhere in the middle we cured, so the class period ended and then had to restart again or something. Probably, but I think that would later become a fact question. Like, at the pleading stage, if you decide that our class period starts here and ends here, then we would get into discovery and figure out what was really false. And maybe this wasn't false and it should start here, but I think that would come later. And so I do want to address the risk language that defendants say is a competing non-culpable inference. And I think that Mr. Feldman might get up here and say that this is exactly like the Bien case, and the court there analyzed the same exact risk language and found that that carried the day for defendants. I think this is a really important argument because the risk language that defendants use say that life luck could be affected by service outages. And I've looked through the warnings that defendants cited throughout their brief, and what they said was they used the word could. I couldn't find anywhere where the warnings say life luck would experience outages or that it was experiencing outages like we allege in our case. All hypothetical, is that what you're saying? Absolutely. And I think the Cutler case here actually controls. If you look at the Cutler case, which is a Ninth Circuit case, the court found the statement misleading because the risk they disclosed used may language, like this may happen. Exactly what life luck did here. And the Ninth Circuit there found that this was insufficient because it omitted the fact that the risk had already come to fruition. And that's what we're arguing, that this 0% of alerts go out twice a week for up to 12 hours, 70% of credit check alerts, and 20% of all alerts, that the severity of that was happening at the time and the risk language can't protect them from that.  Thank you. Thank you. Thank you. May it please the Court, Boris Feldman for life luck in the Appalese. Judge Adelman, we gave you a California welcome this morning at 4.45 in the morning when we had a 3.2 earthquake in Berkeley. I hope that you now feel like a native. Hopefully that will be the only one you have while you're visiting here. I'm going to get into CW4, CW5, whichever CWs the Court would like. But I do think it's important to step back a little since this is the second securities class action before the Ninth Circuit and look at it in that context. Judge Bolton, the district judge in both cases, she had life luck cases for three and a half years. She had life luck one being, in this case, life luck two. This one was filed just after she dismissed life luck one. In the Court of Appeals, unanimously affirmed life luck one. The class period in this case follows right after the class period in that. In many of the issues, not all, but many of the issues are the same. I think as Judge Clifton was pointing out, there's a difference between being dissatisfied with the product and potentially having a consumer claim versus having a securities fraud claim. The securities fraud claim is about misleading the market into thinking things are going way better for the company than they are. In that respect, if you look at what the news in the market disclosed by LifeLock was leading up to and during the class period, I think the last conclusion any court could draw is, boy, they were hyping the stock. February 19, 2014, five months before the class period. This is ER 156. LifeLock discloses that there had been a whistleblower claim against the company about its compliance with the 2010 FTC order, that it was expecting to receive, quote, a formal or informal investigatory request from the FTC for documents and information, close quote, and that at any time the FTC may commence, quote, an inquiry or investigation of LifeLock's compliance with the FTC order, close quote, leading into the class period. So they're already saying we have whistleblowers and we have a request from the FTC. But that doesn't tell the market that when they're advertising real-time alerts, their actual alerts are not real-time. No, and I'm going to address that, Your Honor, but the context is very important. This was not a happy talk company saying everything's going great here. There was a drumbeat of negative disclosure. The next one was on March 17th. That's in ER 157. The company filed a Form 8K, which, as Your Honors know, means, hey, we've got hot news to disclose. They said that the company received, quote, a request from the FTC for documents and information related to LifeLock's compliance with the order, close quote. So is there a case that says that if the company announces that it's having one problem that gets them out of a securities fraud case for another problem? I'm not sure that it's the same problem, Your Honor. It's not unrelated. But if it's not clear, I mean, if it's vague about what the investigation is about, then the market doesn't know if it's the same problem. I think there's a real difference between the announcement that there's an investigation going on and the knowledge if actually possessed by the corporate executives, the individual defendants, that our product doesn't offer what it says it offers. That, in fact, even though we have promised real-time alerts, we're not giving them. The fact that there's an investigation is not an acknowledgement that there's a problem with the product. The second, the allegation which I see in the complaint in front of us, is something a little different. That is that we're not giving the customer what we've promised the customer we'll give them. What in the disclosures made by the company tells the market about problem number two? So the disclosures that this court relied on in LifeLock 1 about the rapid growth of the company and the problems managing that growth. That's a little different as well. This is not unanticipated inability because we've grown too fast. This is allegedly reports given to the top executives that say we're not delivering. We're still not delivering. We're still not delivering. That's not unexpected results. That's not a surprise. That's a continuing problem. If the company has a continuing problem, it can't claim forever that, gee, we're surprised because we're growing so fast. If they're not delivering period A, period B, period C, that's something different. I understand, Your Honor. And then the question is, have the allegations established scienter as to the defendants? And the test there was established by this court in the Digimart case, which it followed throughout. It was a decision by Judge Bybee. He wrote the decision. This court relied on it in Life Lock 1 in evaluating the CWs, as Judge Bolton did below in evaluating the CWs here. And what she found correctly was that none of the allegations by the CWs satisfied the Digimart test. They failed the Digimart test for several reasons. First, they don't establish actual knowledge on the part of the individual defendants. But they allege that this President is receiving all these detailed reports about these stale alerts. Isn't that pretty much? No, Your Honor. You have to separate what counsel says in the brief from what the allegations in the complaint say. With respect to the 70% staleness, that's paragraph 120 of the complaint. It's in excerpt of record. 146, I think. 146, Your Honor. Thank you. Notice that that doesn't say at what point in time. But the paragraph before says March 2015. Is it not implied that the same time period is at issue in the next paragraph? No, not at all. It's a totally separate allegation about the granted presentation. And as Judge Bolton carefully went through each allegation as to the granted presentation, she said, there's no indication that any of the individual defendants attended that or heard it. Paragraph 120 about CW5 mentions the 70%. It does not say when. And elsewhere in the complaint, when it identifies CW5, it said that she worked at LifeLock since 2007. So what about on paragraph 121 at the end of the paragraph where it says, CW5 also confirmed that stale alerts were pervasive and occurred through at least June of 2015, the end of her tenure? Yes. That doesn't indicate that the 70% rate applied there. There's a big difference between saying some alerts were late, and as Judge Clifton got his a few days later about Georgia, there's a difference between saying occasionally there were delayed alerts and saying 70% of them were delayed. The allegation in paragraph 120 doesn't indicate what time period, nor, more important, when CW5 says, well, Mr. Ryan told me that he sent these reports to management, nothing there alleges that the reports showed a 70% staleness rate. So what you have sort of is the legal equivalent of the game of telephone, where it keeps with each retelling from Ryan to CW5 to the plaintiffs. But Judge Bolton analyzed CW5 in detail and said her statement, even if credited, does not establish knowledge of fraud on the part of Hillary Schneider. Aren't we supposed to figure out the most likely inference? Isn't that what we're supposed to analyze this to determine? And if that's so, is there any other inference that the president of this company that's going through all this travail doesn't have a clue as sort of what you're arguing about this? This seems highly unlikely. I don't think I would use the phrase doesn't have a clue. The question is when the company described its products, when it said we provide all these services, were they acting with fraudulent intent in saying a low-level employee said, my experience, which began in 2007, is that this one feature might have 70% staleness, that you can't infer from that that Hillary Schneider acted with fraudulent intent when she talked about her son buying blue jeans at a department store. I don't think you have to say this inference is more likely than that inference. There are situations where you do that under the Reform Act. But here, Digimarc has set out a clear test for establishing CNTR on the part of the corporate executives. The contrast here between a lower-level employee, CW5, who didn't say that she sent the reports to them. She said, well, Ryan told me that he forwarded reports to management. Compare that with a quality systems decision. I mean, doesn't CW5, though, so in paragraph 121, CW5 seems to understand that she's writing these reports that will be sent to executive management, and then it says CW5 confirmed that Schneider was aware of and received this report as early as November 2014. So it then is confirmed by Ryan, but wouldn't CW5 know who the audience was for the reports she's making? No. What you see here is that she sent it to her executives, and when you read paragraph 121, it says CW5 knew this because Rob Ryan told her he was sending Defendant Schneider the reports. So it's not only hearsay, it's vague as to when he did it, and above all, it doesn't say that those reports reflected a 70% staleness rate. That's why Judge Bolton rejected it. If you compare CW5 and her secondhand undated allegations with a quality systems decision that Judge Fletcher wrote, the CWs there were the major shareholder and director and the chief operating officer. And you're saying we can't take the paragraph 120, 70% credit check alerts were stale, and then the reference back to the awareness of the stale alerts in the next paragraph and say that the 70% number carries into the next paragraph about the reports? Correct. It doesn't say that. But so, I mean, it certainly could be implied. So, I mean, if that's the failure, should they have a chance to amend to spell it out more? They had ample opportunity to amend, and, in fact, after the second round of motion to dismiss, they submitted a declaration from CW5 that said, I meant ultimate plus as well as ultimate. But it didn't say the reports during the class period showed a 70% staleness rate. So if that's what she had said, the reason this matters, pardon, I'm catching the voice.  The reason it matters is because there's kind of an arms race on these pleading motions between what the CW told the lawyers, what the CWs didn't, and the lesson of digimarc that I think Judge Bolton followed in Life Lock 1 and Life Lock 2 is, does this get to the point of showing fraudulent intent on the part of management? If you look at the statements attributed to President Schneider, there's nothing that she said that contradicted by this. For example, I think most of the statements, in fact, that are challenged are by the CEO, Mr. Davis. As Your Honor indicated, there's nothing about power. But even as to Schneider, even if you assume that she said at a luncheon that, yeah, I know, we have a staleness issue, that doesn't establish that she was committing securities fraud in describing the company's products. If that were enough, then every time a company, either in its investor presentations or its SEC filings or on its website, described its products, and you could find a former employee who said, well, it didn't always do that, and we had reports that showed it didn't always do that, that would be enough to get you past a securities fraud claim. And it can't be that that's what it does. The other, the fundamental reason, in my opinion, why the case should be affirmed, is what this Court held in Life Lock 1, quote, That was the earlier Court's opinion at 953. And fundamentally, that's what you have here. You have allegations that the product didn't work as well as the company may have represented in its promotional materials, and that that constitutes securities fraud. Remember, during the class period, no defendant is alleged to have sold a single share of stock. The company was not doing acquisitions with its stock. And although motive and opportunity is not a sine qua non of a 10b-5 claim, it is an element that this Court regularly looks at. And here, where they're in the midst of amply disclosed contentiousness with the FTC about compliance with the consent decree, and nobody's selling any stock, the Court should be wary of converting a consumer complaint situation into federal securities fraud. Thank you, Your Honors. Thank you, Counsel. So I just want to address the stale alert issue and what stale means. Confidential Witness No. 5 actually gives the definition of what stale is. In paragraph 120, she says, A stale alert meant that the alert was at least one week old. So when she's referring to stale alert and these are her words, that's what she's referring to. It carries into paragraph 121 that the executives were aware of the stale alert issue and the reports had the stale alerts in them. That's at line 24 of paragraph 121. The reports included detailed statistics on alerts, including stale alerts. Finally, at the end of paragraph 121, Judge Friedland, you pointed this statement out, CW5 confirmed that the stale alerts were pervasive and occurred through at least June of 2015. In addition to the allegations of CW4, who provides even more rampant and pervasive allegations of how the- So your opposing counsel is arguing that because only paragraph 120 has the 70% number and not the next paragraph, we can't carry it over and we don't know that the time periods from the later paragraph carry to the earlier one. So do you have a case that talks about how we're supposed to read paragraphs of the complaint under the PSLRA and whether we can connect the dots like you're wanting to? I think we're entitled to a fair inference as to what CW5 said taken together, what it all means. And I think the fact that she defined what a stale alert means, means that it should carry through the rest of her allegations for the stale alerts. And so we would encourage the court to look at this through the lens of Oracle, which requires the court to determine whether defendants actually had access to these reports and deliberately ignored the reports or whether they actually knew it was in the reports because they had access to them. I think if you look at the Oracle standard that I mentioned earlier, Schneider and the other defendants had reasonable grounds to believe material facts existed, but they nonetheless failed to obtain and disclose these facts, although they could have done so without extraordinary effort. Any questions? Thank you, Your Honors. Thank you, counsel. Thank you both sides for the helpful arguments. The case is submitted and we are adjourned for the day.
judges: Clifton, Friedland, Adelman